FARRIER JONES, BY NEXT FRIEND, v. SEABOARD AIR LINE
RAILWAY COMPANY.

(Filed 14 April, 1909.)

1. **Railroads—Master and Servant—Torts—Liability of Master—
Scope of Employment.**

   For the torts of the servant the liability of a railroad com-
pany is limited to those committed within the scope of the em-
ployment in furtherance of its business.

2. **Same—Judgment Upon the Verdict.**

   In an action for damages from an injury to plaintiff, caused by
being shot by the servant or employee of defendant railroad com-
pany, the jury found, upon issues submitted without objection,
that defendant's servant shot and injured the plaintiff in a reck-
less and wanton manner; that he was not acting within the scope
of his employment at the time, and that plaintiff was entitled to
recover in a certain sum: *Held*, defendant was entitled to have
his motion for judgment upon the verdict allowed.

ACTION tried before *Long, J.,* and a jury, at October Term,
1908, of SCOTLAND.

Action for damages, alleged to have been sustained by plain-
tiff by reason of an assault committed upon him by defendant's
agent while acting in the scope of his employment.

The plaintiff testified that he attempted to climb upon defend-
ant's box car, attached to a moving freight train, catching hold
of the iron bars for the purpose of stealing a ride; that a flag-
man on top of the car told plaintiff to come up to him, when he
(plaintiff) started to run; that he had gone about eight feet
from the car, when the flagman shot him—shot him twice—
inflicting the injury from which he suffered, etc. Plaintiff was,
at the time of the shooting, sixteen years of age. This was the
entire evidence in regard to the transaction. There was evi-
dence regarding the extent of the injury. Defendant moved the
court for judgment of nonsuit; motion denied. Exception.. His
Honor submitted the following issues to the jury:

1. "Was the plaintiff injured by the reckless and wanton acts
of the defendant's agent, as alleged in the complaint?

2. "If the plaintiff was injured by the reckless and wanton
acts of the defendant's agent, as alleged in the complaint, was

such agent, at the time, acting in the line of his duty, scope of his employment and furtherance of the business of defendant company?

3. "What damage, if any, is plaintiff entitled to recover?"

The jury answered the first issue "Yes," the second "No," and the third "Two hundred dollars."

Defendant moved for judgment upon the verdict; motion denied. Defendant excepted. Judgment for plaintiff. Defendant excepted, assigned errors and appealed.

*Jonathan Peele* and *J. A. Lockhart* for plaintiff.
*John D. Shaw* and *Murray Allen* for defendant.

CONNOR, J., after stating the case: Passing the question raised by defendant's exception to his Honor's refusal to grant the motion for judgment of nonsuit, and assuming, for the purpose of disposing of this appeal, that the question whether the flagman, when he shot plaintiff, was acting in the scope of his employment or the line of his duty, was properly submitted to the jury, the defendant is entitled either to a judgment upon the verdict or to a new trial. While the members of the Court are not agreed in regard to the correctness of his Honor's ruling upon the motion for judgment of nonsuit, a majority of them are of the opinion that defendant was entitled to have its motion for judgment upon the verdict allowed. Whatever differences of opinion may have existed in the past, the decided weight of judicial opinion concurs that for torts committed by the servant while on duty and acting within the scope of his employment or line of his duty, proximately injurious to another, the master is liable. The fact that the tort was committed recklessly, wantonly or willfully, if within the scope of the employment, does not exonerate the master. The view which has, after most careful consideration, been adopted by both English and American courts is thus stated by Sir Frederick Pollock, probably the most accurate writer on the subject now living: "A master may be liable for the willful and deliberate wrongs committed by the servant, provided they be done on the master's account and for his purposes." For an interesting and exhaustive discussion of this subject see 2 Beven on Neg., Book IV, p. 554. This limi-

tation is both scientific and practical. Certainly no one will seriously contend that a master is an insurer of his servant's conduct in respect to torts committed by him while in his employment, without regard to the pivotal question whether such conduct had any relation to or was in the scope of the employment. To maintain that he is, it must follow that almost unlimited control should be given the master over the servant, to the end that he may protect himself against such unlimited liability. The law must be both reasonable and practical—that is, it must commend itself to the sense of justice of the average man and be capable of practical application to the manifold relations of our modern, industrial, social and domestic life. It is manifest that judicial thought upon the subject, since the decision of *McManus v. Crickett,* 1 East., 106, has been affected by the introduction of the industrial corporation into the field of litigation, and the measure and standard of liability of the master for the torts of the servant has been enlarged and extended to meet the changed conditions of employment of servants by these impersonal agencies. Liability has been fixed upon corporations for torts of its servants which, if applied to natural persons engaged in mercantile, mechanical and agricultural employments, and especially to those employing domestic servants, would shock the reason, produce startling consequences and be restricted by legislation. Mr. Beven, speaking of the development of the doctrine of liability of the employer for the torts of his employee, says: "From this limited beginning its scope has become so almost universal in modern law that Jessell, M. R., thus comments on it: 'It is clear that, on principle, a man is liable for a man's tortious act if he expressly directs him to do it, or if he employs that other person as his agent, and the act complained of is within the scope of the agent's authority.' I agree that the court ought to be very careful how it extends the doctrine, *respondeat superior.* It has been carried in our law very far, indeed—I think, quite far enough." *Smith v. Keal,* 9 Q. B. D., 351. However this may be, and whether the law is at present upon a permanent and satisfactory basis, it is manifest that for the torts of the servant the master's liability is limited to those committed within the scope of the employment—

in furtherance of his business; for, as said in *McManus v. Crickett, supra,* "No master is chargeable with the acts of his servant but when he acts in the execution of the authority given him." The same thought is clearly expressed by *Mr. Justice Walker,* in *Daniels v. Railroad,* 136 N. C., 517: "When a servant quits sight of the object for which he is employed and, without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him, and his master will not be answerable for his acts." The subject has been so recently discussed by all of the members of this Court, and all of our own and many other authorities cited, in *Stewart v. Lumber Co.,* 146 N. C., 47, that no good results would come from a repetition of what was there written. While the writer of this opinion, upon the verdict of the jury in that case, dissented from some of the views expressed in the prevailing opinion, he does not understand that the decision in that case brings into question the principle that liability of the master for the torts of the servant is limited to those done in the scope of the employment. The principle upon which the opinion of *Mr. Justice Brown* rested, concurred in by the *Chief Justice* and *Mr. Justice Hoke,* was that when the master placed in the control of his servant a dangerous instrumentality for the purpose of carrying on his business, the law imposed upon him the duty of prevision and precaution. This view was very strongly stated in the concurring opinion of *Mr. Justice Hoke.* While the writer differed from the Justices in the application of the principle to the instrumentality used in that case, he concedes that the principle is sustained both by reason and authority, and regards the question as settled, in the future cases coming before the Court, by that decision. Applying the principle to the record in this appeal, we find that his Honor, without objection by plaintiff, submitted two issues—the first, directed to the allegation that plaintiff was injured by the reckless and wanton conduct of defendant's agent, and, second, whether at the time the assault was committed the agent was acting in the line of his duty, etc. It is true that the first issue concluded with the words "as alleged in the complaint." When we refer to the complaint we find that plaintiff sets out the transaction in

detail and in several aspects. We think that, read in the light of his Honor's instruction and the submission of the second issue, the finding by the jury upon the first issue referred to the manner in which the assault was committed—that is, recklessly and wantonly. In stating the contentions of the parties his Honor calls attention to the testimony of the plaintiff and the contention of defendant, that plaintiff was shot "at some other time and place, and was not shot by any agent of the defendant company." He concludes this part of the charge by saying that the burden is upon plaintiff to satisfy the jury that "what he says about it is true." His Honor then defines a wanton, reckless act, saying: "You will notice that this issue presents to you the question as to whether this was a wanton act, and I undertake to tell you what, in the eye of the law, a wanton act is. If, under the instructions I have given you, gentlemen, your answer should be 'No,' it will not be necessary for you to answer the second and third issues." We quote the charge to show that the only question presented to the jury upon the first issue was whether the flagman shot plaintiff in a reckless and wanton manner. His Honor recognized the fact that plaintiff must not only establish the allegation that defendant's servant assaulted him, but must go further and show that the wanton, reckless assault was committed by the employee while acting in the scope of his employment and line of duty. The second issue was therefore consistent with the finding upon the first and necessary to establish a complete cause of action. While the plaintiff's evidence was uncontradicted, it was the province of the jury to draw the inference whether the employee was acting in the scope of the employment. "The inquiry as to the scope of the servant's employment being for the jury (unless the act is manifestly out of the course of the servant's employment, where a nonsuit is proper), the reported cases turn, in nearly every instance, either on the validity of the finding or on the question whether there is evidence for the jury." Beven Neg., 584. The question involved in the second issue might have been tried and determined on the first if his Honor had seen proper to do so. This was done in *Pierce's case,* 124 N. C., 83, where the court charged the jury that if they found that the injury was inflicted

by the servant, in the course of his employment, to find the issue
for the plaintiff.   The plaintiff did not except to the submission
of the second issue to the jury or the instruction of the court.
The question is therefore not presented whether, as a matter of
law, his Honor should have held that the servant was acting in
the full scope of his employment.   We have been unfortunate
if we have not been able to make ourselves understood in this
case.   We do not hold, nor is there any word in the opinion to
justify the suggestion to the contrary, that corporations or nat-
ural persons are privileged to shoot people.   No such question
is raised by any exception in the record, nor was it suggested
upon the argument.   We simply hold that when, without objec-
tion or exception, an issue is found by the jury that the defend-
ant's servant was not acting within the scope of the employment
when he committed the assault, the employer is not liable.   This
is elementary, and the courts, "without variableness or shadow
of turning," have uniformly so held.

In *Palmer v. Railroad,* 131 N. C., 250, the opinion concludes
with the words, "The employee must have been acting at the
time within the scope of his employment on the defendant's
car."   The jury—not the court—found that in this case he was
not so acting.   We are unable to perceive how we can, in the
face of this finding, without a single exception by the plaintiff,
do otherwise.   No motion was made to set the verdict aside.
This disposition of the appeal renders it unnecessary to consider
the charge in regard to the character and measure of damages
which could be awarded.   The judgment must be reversed, with
direction to enter judgment that defendant go without day, etc.

Reversed.

BROWN, J., concurring: I concur in the opinion written for
the Court by *Mr. Justice Connor,* which to my mind is con-
clusive that the defendant company is not liable for the unwar-
ranted and unauthorized act of its brakeman in shooting at the
plaintiff.   There is not a scintilla of evidence in the record that
the brakeman shot at the plaintiff in an endeavor either to keep
plaintiff off the train or to put him off after he was on.   Upon
all the evidence the act of the brakeman was neither authorized
by the defendant nor done in the discharge of the brakeman's

JONES *v.* RAILROAD.

duty to it. It was plainly a reckless, "devil-may-care" act, for the consequences of which the person who did it should be punished, and not his innocent employer, who could not prevent it and did not ratify it.

In the *Stewart case,* in my opinion, the company is held liable upon a well-defined ground, supported by most respectable authority, to the effect that a steam locomotive is such a dangerous instrumentality that the company is liable for the manner in which the engineer selected by the company uses it when running it in the company's business. That principle is not involved in the case.

I do not understand, nor do I think anyone else seriously believes, that railway or other corporations claim for their employees the privileges of the ancient nobility of France to shoot down innocent persons at will or to commit other lawless acts. I have so much respect for the great mass of railway employees that I do not think they merit any such severe censure. My experience has convinced me that they are very generally a most faithful, law-abiding as well as highly respected class of our industrial population. But now and then, as in all other callings, however great or however humble, some reckless individual will be found. When his lawless act is done in the discharge of his duty to his master, or when it is authorized or ratified by him, then the master is justly held to be liable for the damage inflicted, however innocent the master may be; but when such act was not done in furtherance of the master's business, and was neither authorized nor ratified by him, but was the wanton, reckless, personal act of the servant, which the master could neither foresee nor prevent, and does not ratify, then it is neither law nor justice to hold the master responsible, and this applies to corporate as well as individual employers of labor.

Such has been the law of this and our mother country from time immemorial.

CLARK, C. J., dissenting: The plaintiff was attempting to climb up on the defendant's box car to steal a ride. A flagman on top, discovering him, told him to "Come on up." Whether the menacing tone, or the fact that he was discovered, or, as is probable, the flourish of a pistol, intimidated the plaintiff, he

started to run, and when about eight feet from the car the flag-
man shot the plaintiff, striking him twice. This was one con-
tinuous act. The flagman was in discharge of his duty in dis-
covering the plaintiff, and could not put off that character and
without change of position assume another while the plaintiff
was running eight feet, which a calculation shows was less than
half a second. He could not be an employee of the railroad
when he frightened the man and cease to be an employee and
fire two accurate shots within the half second, or 1-120 part of
a minute, while the badly frightened man was running eight
feet. As the flagman fired and struck the fleeing man twice be-
fore he could run eight feet, the pistol must have been drawn
and presented before the plaintiff turned to fly. The remark
of the flagman, "Come up here," must have been accompanied
by the presented pistol, which caused the precipitate retreat of
the plaintiff. The act of the flagman was continuous, and the
shooting was so quick—two shots that were hits, before the scared
man could move more than eight feet—that it cannot be divided.
But, independent of that, the flagman was at his post, in the
exercise of his employment, and for his conduct the defendant
is responsible. *Hayes v. Railroad,* 141 N. C., 195.

This Court has held again and again that a railroad is liable
for the conduct of its agents, whether negligent or willful and
wanton, when the act is done in the course of their employment.
In *Jackson v. Tel. Co.,* 139 N. C., 347, it was held that the
corporation must answer for the servant's wrongful act, "if
committed in the scope and course of the servant's employment,"
and that he is in such scope and course of employment if he
"is at the time about his master's business." If this were not
so, the corporation would never be liable, for it does not hire its
employees to do negligent acts or commit wanton and willful
wrongs.

The company was held liable when its station agent got into
a difficulty with an ex-passenger, over the delivery of a trunk,
and killed him, though he was certainly not employed to kill
passengers. *Daniel v. Railroad,* 117 N. C., 592. Nor was the
conductor employed to kiss a female passenger, but he was on
duty, and the company was held liable, in *Strother v. Railroad,*

123 N. C., 197. Nor was the fireman employed to throw a chunk of coal to frighten a boy who was stealing a ride on the tender, but the company paid for the resultant injury. *Pierce v. Railroad,* 124 N. C., 84. Nor were the employees authorized to throw stones at a tramp stealing a ride; in fact, the duties of some did not involve that of making the tramp get off, but the company was held liable. *Cook v. Railroad,* 128 N. C., 333. The fact that here the employee used a pistol instead of stones, and that a half-second after the man had gotten off and was eight feet away, is an aggravation and not a defense.

In *Stewart v. Lumber Co.,* 146 N. C., 47, the company was held liable for the wanton conduct of employees as to one neither a passenger nor a trespasser, by blowing the whistle and hollering to frighten plaintiff's horse, which was injured in the resultant runaway. The question in that case, which divided the majority of the Court, whether the plaintiff could recover punitive damages or actual damages, does not now arise, but four of the Court agreed that the action could be maintained, as had been done on a similar state of facts in *Brendle v. Railroad,* 125 N. C., 474; *Hussey v. Railroad,* 98 N. C., 34. The company was held liable for torts of its agents, even when *ultra vires.* *Gruber v. Railroad,* 92 N. C., 1; *White v. Railroad,* 115 N. C., 636; *Waters v. Lumber Co., ib.,* 652. In the unanimous opinion of the Court, in *Foot v. Railroad,* 142 N. C., 52, the railroad was held liable for the willful and wanton misconduct of its employee, citing *Brendle v. Railroad, supra.*

There are many other cases to the same effect in this and the other States. It is difficult to see how the company is liable if the employee throws stones or coal at a trespasser, or frightens him, by cursing, into jumping off *(Hayes v. Railroad,* 141 N. C., 195), but is not liable if lead is used; nor how it is responsible to one off the right of way for injuries resulting from frightening his horse by shouts and blowing the whistle, and not liable for shooting one on the right of way and not eight feet from the car.

The liability of a farmer, merchant or other citizen, in the performance of his inherent right to do business, for the conduct of his agents is necessarily not as broad as that of these great

JONES *v.* RAILROAD.

corporations, which are given artificial existence and great special privileges, on the ground, not only that they shall be used for the public benefit, but on the implied agreement that they shall not be used to the public detriment. Using vast physical and pecuniary power, they must be liable for its misuse; and, employing great numbers of men, they alone can control them, and are responsible for their discipline. They are liable for negligence of a fellow-servant and for public regulation of their charges and conduct. If an employee on a rapidly moving train throws rocks or fires into a crowd, he could rarely be identified or found able to respond in damages. If he killed a citizen's horse or cow by shooting from the top of the train, the company would be responsible. Why not when he shoots a man?

Jaggard on Torts, sec. 86, thus correctly sums up the result of the authorities: "The master is liable for the conduct of his servant, within the course of his employment, not only where responsibility would attach under the test or scope of his employment, but also where the conduct is not intended to be for the master's benefit, but for the servant's malicious, capricious or other private purpose, and whenever a duty rests on the master to avoid doing harm to the third persons and the servant violates that duty in the course of his employment."

Under the reign of privilege in France one of the privileged class was seen to shoot a workman from the top of a building for the pleasure of seeing him tumble to the ground. He was not held to account, but the incident aided to topple over the French monarchy to its death. Corporations cannot claim such privileges for its officers or employees. If employees on a moving train can fire at cattle or at people along the track at will, without any responsibility on the part of the company, because the act is willful and wanton, then the company is using its vast privileges, not upon terms of liability for good behavior to the public, but upon the narrow ground that, like a private business, it is only responsible for the conduct that it authorizes. It was wrong for the plaintiff to attempt to steal a ride, but the penalty for such offense is not execution by shooting.

Upon the finding on the first and third issues the court properly rendered judgment. The finding on the second issue, very

clearly, was meant not to negative the finding on the first issue that the shooting was "reckless and wanton, and as alleged in the complaint," but merely to negative that it was "in futher-ance of the business" of the defendant. The second issue was immaterial and irrelevant and should be disregarded.